1  Craig C. Corbitt (No. 83251)
   Matthew R. Schultz (No. 220641)
2  Jiangxiao Athena Hou (No. 215256)
   Patrick B. Clayton (No. 240191)
3  ZELLE, HOFMANN, VOELBEL,
      MASON & GETTE LLP
4  44 Montgomery Street, Suite 3400
   San Francisco, California 94104
5  Telephone:     (415) 693-0700
   Facsimile:     (415) 693-0770
6
7  Attorneys for Plaintiff and the Class

8

9

10                      **UNITED STATES DISTRICT COURT**

11                    **NORTHERN DISTRICT OF CALIFORNIA**

12                        **SAN FRANCISCO DIVISION**

13  MICAH ABRAMS, individually and on behalf )   Case No.
    of all others similarly situated,         )
14                                             )   **CLASS ACTION COMPLAINT**
                     Plaintiffs,               )
15                                             )   **DEMAND FOR JURY TRIAL**
                                               )
16            vs.                              )
                                               )
17  AIR NEW ZEALAND LTD.; ALL NIPPON          )
    AIRWAYS CO. LTD.; CHINA AIRLINES,          )
18  LTD.; EVA AIRWAYS CORPORATION;             )
    JAPAN AIRLINES INTERNATIONAL CO.           )
19  LTD.; MALAYSIA AIRLINE SYSTEM              )
    BERHAD; NORTHWEST AIRLINES, INC.;          )
20  QANTAS AIRWAYS, LTD.; SINGAPORE            )
    AIRLINES, LTD.; and THAI AIRWAYS           )
21  INTERNATIONAL PUBLIC COMPANY,              )
    LTD.,                                      )
22                                             )
                                               )
23                   Defendants.               )
                                               )
24  _____)

25       Plaintiff, on behalf of himself and all other similarly situated, hereby brings this

26  action against all defendants named herein, for treble damages and injunctive relief under the

27  federal antitrust laws of the United States, Section 1 of the Sherman Antitrust Act of 1890

28  (15 U.S.C. §1) and Sections 4 and 16 of the Clayton Antitrust Act of 1914 (15 U.S.C. §§15

                                          -1-
                                CLASS ACTION COMPLAINT

and 26). Plaintiff complains and alleges as follows:

## I.    INTRODUCTION

1.    This action arises from a global conspiracy by defendants, their subsidiaries, agents, or co-conspirators, to fix, maintain, and/or stabilize prices for long haul passenger transpacific flights to and from the United States ("Transpacific Air Passenger Transportation"), and to fix fuel surcharges on such transportation ("Fuel Surcharges").

2.    Plaintiff brings this action on behalf of himself individually and on behalf of a plaintiff class (the "Class") consisting of all persons and entities who purchased Transpacific Air Passenger Transportation services from any of the named defendants and their co-conspirators, or any predecessor, subsidiary, or affiliate of each, during the period between January 1, 2004 and the present (the "Class Period").

3.    Defendants are major international airlines.  At all relevant times, defendants serviced many of the transpacific routes to and from the United States and were competitors of each other.  During the Class Period, defendants conducted and sold Transpacific Air Passenger Transportation, and charged collusively fixed Fuel Surcharges on that transportation, including but not limited to flights to and from San Francisco ("SFO") and to and from Los Angeles ("LAX") in the State of California, which are considered the U.S. gateways to Asian and Pacific countries.

4.    As a result of defendants' unlawful conduct and conspiracy, plaintiff and the other members of the Class paid artificially inflated prices for such Transpacific Air Passenger Transportation and Fuel Surcharges and have been damaged accordingly.

## II.    JURISDICTION AND VENUE

5.    Plaintiff brings this action under Sections 4, 12 and 16 of the Clayton Act (15 U.S.C. §§ 15, 22 and 26) for treble damages and injunctive relief, as well as reasonable attorneys' fees and costs, against defendants for the injuries sustained by plaintiff and members of the Class for violations by of the federal antitrust laws, including Section 1 of the Sherman Antitrust Act (15 U.S.C. §1).

///

-2-

1    6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331,
2    1337(a) and 1367, and Sections 4, 12 and 16 of the Clayton Act (15 U.S.C. §§ 15, 22 and
3    26).

4    7.    Venue is proper in this judicial district pursuant to 15 U. S.C. §§15 and 22,
5    and 28 U.S.C. § 1391(b) and (c) because one or more of the defendants is licensed to do
6    business, transacts business, is found, or has agents within this district; and because a
7    substantial part of the events giving rise to plaintiff's claim occurred, and a substantial
8    portion of the affected interstate trade and commerce described below has been carried out,
9    in this district.

10    8.    This Court has *in personam* jurisdiction over each of the defendants because
11    each engaged in an illegal price-fixing scheme and conspiracy that was directed at and/or
12    caused injury to persons and entities residing in, located in, or doing business in the Northern
13    District of California and throughout the United States.

14                        **III.    PARTIES**

15    9.    Plaintiff Micah Abrams is a resident of Los Angeles County, California.
16    During the Class Period, Plaintiff Abrams purchased Transpacific Air Passenger
17    Transportation from one of more defendants and was injured as a result of defendants' illegal
18    conduct alleged herein.

19    10.    Defendant Air New Zealand, Ltd. ("Air New Zealand") is a New Zealand
20    company with its principal place of business at Level 19, Quay Tower, 29 Customs St. West,
21    Auckland, 1020, New Zealand.  Air New Zealand is considered the South Pacific's largest
22    international carrier and provides service within New Zealand, as well as to and from
23    Australia, the South Pacific, Asia, North America and the United Kingdom.  Air New
24    Zealand operates daily nonstop flights from San Francisco to Auckland.  Air New Zealand
25    conducts Transpacific Air Passenger Transportation throughout the world, including into the
26    U.S. and especially California.

27    11.    Defendant All Nippon Airways Co., Ltd. ("All Nippon") is a Japanese
28    company with its principal place of business at Shiodome-City Center, 1-5-2, Higashi-

-3-

1   Shimbashi, Minator-Ku, Tokyo 105-7133, Japan. All Nippon is Japan's second largest

2   domestic and international airline, operating 49 domestic and 22 international routes. All

3   Nippon conducts Transpacific Air Passenger Transportation throughout the world, including

4   into the U.S. and especially California.

5       12.     Defendant China Airlines, Ltd. ("China Air") is a Taiwanese company with its

6   principal place of business at 131, Section 3, Nanking East Road, Taipei, Taiwan. China Air

7   was the first Asian carrier to fly the transpacific route between Taiwan and the United States.

8   China Air conducts Transpacific Air Passenger Transportation throughout the world,

9   including into the U.S. and especially California.

10      13.     Defendant EVA Airways Corporation ("EVA Air") is a Taiwanese company

11  with its principal place of business at 376 Hsin-Nan Rd, Section 1, Luchu, Taoyuan Hsieh,

12  Taiwan. EVA Air is the largest privately owned Taiwanese airline. It operates passenger

13  service to international destinations in Asia, Australia, New Zealand, Europe and North

14  America. EVA Air conducts Transpacific Air Passenger Transportation throughout the

15  world, including into the U.S. and especially California. In the summer of 2007, EVA Air

16  flew seventeen flights a week to Los Angeles, twelve flights per week to San Francisco, four

17  weekly non-stop flights to Seattle and three weekly flights to New York.

18      14.     Defendant Japan Airlines International Co. Ltd. ("Japan Air") is a Japanese

19  company with its principal place of business at 4-11 Higashi-Shinagawa 2-chome,

20  Shinagawa-Ku, Tokyo 140-8637, Japan. Japan Air is one of the largest air carriers in the

21  world and the largest airline operator in Asia. Japan Air conducts Transpacific Air Passenger

22  Transportation throughout the world, including into the U.S. and especially California.

23      15.     Defendant Malaysia Airline System Berhad ("Malaysia Airline") is a

24  Malaysian corporation with its principal place of business at MAS Complex A, Sultan Abdul

25  Shah Airport, 47200 Subang, Selangor, Malaysia. Malaysia Airline conducts Transpacific

26  Air Passenger Transportation throughout the world, including into the U.S. and especially

27  California.

28  ///

1    16.    Defendant Northwest Airlines, Inc. ("Northwest") is a Delaware corporation
2    with its principal place of business at 2700 Lone Oak Parkway, Eagan, Minnesota 55121.
3    Northwest flies to more than 240 cities in North America, Asia, and Europe. It operates
4    more than 200 non-stop flights between the United States and Asia each week. Northwest
5    conducts Transpacific Air Passenger Transportation throughout the world, including into the
6    U.S. and especially California.

7    17.    Defendant Qantas Airways, Ltd. ("Qantas") is an Australian company with its
8    principal place of business at 203 Coward Street, Mascot NSW 2020, Australia. Qantas is
9    the largest domestic and international carrier in Australia. Qantas conducts Transpacific Air
10   Passenger Transportation throughout the world, including into the U.S. and especially
11   California.

12   18.    Defendant Singapore Airlines, Ltd. ("Singapore Air") is a Singaporean
13   company with its principal place of business at Airline House, 25 Airline Road, Singapore
14   819829. Singapore Air is one of Asia's leading airlines. Singapore Air conducts
15   Transpacific Air Passenger Transportation throughout the world, including into the U.S. and
16   especially California.

17   19.    Defendant Thai Airways International Public Company, Ltd. ("Thai Air") is a
18   Thai company with its principal place of business at 89 Vibhavadi-Rangsit Road, Bangkok
19   10900, Thailand. Thai Air flies to 74 destinations in 34 countries on four continents. Thai
20   Air conducts Transpacific Air Passenger Transportation throughout the world, including into
21   the U.S. and especially California.

22   20.    At all relevant times, other airlines, trade groups, or other persons or entities,
23   have willingly conspired with defendants in the antitrust violations alleged herein and have
24   performed acts and made statements in furtherance of the antitrust violations and
25   conspiracies alleged herein.

26   21.    The acts alleged against the defendants in this Complaint were authorized,
27   ordered, or done by their officers, agents, employees, or representatives, while actively
28   engaged in the management and operation of defendants' businesses or affairs.

-5-

1

## IV.    CLASS ACTION ALLEGATIONS

2      22.    Plaintiff brings this action both on behalf of himself individually and as a

3    class action pursuant to Federal Rules of Civil Procedure, Rule 23(a) and (b)(3) on behalf of

4    the following class (the "Class"):

5          All individuals and entities in the United States who purchased
          Transpacific Air Passenger Transportation from any of the Defendants and
6          their co-conspirators or any predecessor, subsidiary, or affiliate of each,
          between January 1, 2004 and the present. The Class does not include: (1)
7          defendants; (2) defendants' parents, subsidiaries, or affiliates; (3) any
          governmental entities; (4) any co-conspirators; or (5) any judicial officer
8          to whom this case is assigned.

9      23.    Plaintiff does not know the exact number of Class members because such

10   information is in the exclusive control of Defendants.  The identity of Class members can be

11   readily determined from defendants' own ticketing and sales records.  Given the nature of the

12   trade and commerce involved, plaintiff believes there are most likely hundreds of thousands,

13   if not millions, of Class members in the United States such that joinder of all Class members

14   is impracticable.

15     24.    Plaintiff's claims are typical of the claims of the Class members in that

16   plaintiff purchased Transpacific Air Passenger Transportation from one or more defendants,

17   all Class members were damaged by the same wrongful conduct by defendants and their co-

18   conspirators as alleged herein, and the relief sought is common to the Class.

19     25.    There are questions of law or fact common to the Class, including:

20          a.    Whether defendants engaged in a contract, combination or conspiracy

21                among themselves to fix, raise, maintain and/or stabilize the prices of

22                Transpacific Air Passenger Transportation and Fuel Surcharges herein;

23          b.    The duration of the conspiracy alleged in this Complaint and nature

24                and character of the acts performed by defendants in furtherance of the

25                conspiracy;

26          c.    Whether the alleged conspiracy violated Section 1 of the Sherman Act;

27          d.    Whether defendants' conduct as alleged herein caused injury to the

28

1                 businesses and property of plaintiff and other members of the Class;

2                 and

3            e.     The effect of defendants' conspiracy on prices of Transpacific Air

4                 Passenger Transportation and the appropriate measure of class-wide

5                 damages.

6      26.     These questions of law or fact are common to the Class and predominate over

7 any other questions affecting only individual Class members.

8      27.     Plaintiff will fairly and adequately represent the interests of the Class in that

9 their claims are typical of the claims of the Class members, and their interests are coincident

10 with and not antagonistic to those of other members of the Class. Furthermore, plaintiff is

11 represented by competent counsel experienced in the prosecution of antitrust and class action

12 litigation.

13      28.     A class action is superior to the alternatives, if any, for the fair and efficient

14 adjudication of this controversy. Prosecution of separate actions by individual Class

15 members would create the risk of inconsistent or varying adjudications, establishing

16 incompatible standards of conduct for the defendants.

17      29.     This class action presents no difficulties in management that would preclude

18 maintenance as a class action.

19                      **V.**     **TRADE AND COMMERCE**

20      30.     During the Class Period, defendants sold substantial quantities of Transpacific

21 Air Passenger Transportation and Fuel Surcharges in a continuous and uninterrupted flow of

22 interstate and international commerce to customers throughout the United States.

23 Defendants' unlawful conduct as alleged herein had a direct, substantial and reasonably

24 foreseeable effect upon interstate and international trade and commerce in the United States.

25                   **VI.**     **FACTUAL ALLEGATIONS**

26      A.     Fuel Costs in Air Passenger Transportation

27      31.     Full service airlines, like defendants, have a high level of operating costs

28 necessary to establish and maintain air transportation services. In the past, airlines have

-7-

1    attributed anywhere from 10 to 20 percent of their operating costs to jet fuel. Technological

2    improvements have provided a 70 percent improvement in fuel efficiency in the last 30 years,

3    and further incremental improvements are expected in the years ahead. Even existing

4    aircrafts can be retrofitted to offer additional fuel savings of up to 3 to 5 percent.

5         32.    Fuel costs among airlines can vary significantly due to a number of factors,

6    including variable currency rates, the efficiency of aircrafts, air route designs, air traffic

7    control, and the individual airline's fuel conservation efforts.

8         33.    Fuel costs also vary among airlines because of the use of hedging, an

9    investment strategy that locks in future fuel costs at a certain price. Different airlines hedge

10   their fuel costs to different degrees. For example, in 2005, Thai Air hedged 31 percent of its

11   annual fuel needs. Qantas hedged 70 percent of its 2007 fuel costs. Air New Zealand also

12   stated it has hedged 62 percent of its 2008 estimated fuel use.

13        34.    During the Class Period, the defendants have imposed Fuel Surcharges in

14   addition to base fares for Transpacific Air Passenger Transportation. Fuel Surcharges are a

15   separate component of the price of air travel and are often treated by defendants and other

16   carriers as a tax or other surcharge, such as an airport facility charge or a government

17   mandated September 11 security charge. Thus, airlines usually advertise fares without

18   including taxes, charges, and additional fees, so the true costs of passenger air transportation

19   services are not readily apparent to travelers.

20        35.    The airlines justify their fuel surcharges by claiming that Fuel Surcharges are

21   necessary to offset increases in jet fuel prices. However, since their inception in 2004, the

22   ratio of defendants' Fuel Surcharges to external costs have increased steadily, without regard

23   to the defendants' actual fuel costs or fuel cost increases.

24        B.    Defendants and the Passenger Flight Market

25        36.    The international airline industry is distinguished by a number of

26   interrelationships that create a high risk of collusion, including shared ownership, marketing

27   alliances, and code sharing agreements.

28   ///

1      37.    Each defendant possesses significant market share on its routes of travel. The

2  principal competitors for the defendants in the transpacific long haul passenger air

3  transportation market are one another.

4      38.    Consumers perceive Transpacific Passenger Air Transportation as essentially

5  a fungible commodity. Transpacific Passenger Air Transportation provided by one airline is

6  readily substitutable for the Transpacific Passenger Air Transportation by other airlines.

7  Price is the primary factor driving consumer choice as between airlines.

8      39.    The Transpacific Passenger Air Transportation market in the United States

9  and worldwide is highly concentrated, and there exists substantial barriers to entry in this

10  market. These factors facilitate the implementation and maintenance of a horizontal price-

11  fixing cartel.

12      40.    Since the late 1990s, marketing alliances among international airlines has

13  become common.

14      41.    The Star Alliance includes among others defendants Air New Zealand, All

15  Nippon, Singapore Air, Northwest, and Thai Air. As of December 2007, Star Alliance's

16  market share was 29.1% of the global market based on revenue passenger kilometers.

17      42.    Qantas, Japan Air, and British Air are member of the Oneworld global

18  alliance. As of December 2007, Oneworld's market share was 21.5% of the global market

19  based on revenue passenger kilometers.

20      43.    Code sharing is another type of popular airline marketing partnership, where

21  by mutual agreement between cooperating carriers, two or more airlines each use their own

22  designator codes on the same aircraft operation. Although only one airline operates the flight,

23  each airline in a code-sharing arrangement may hold out, market and sell the flight as its own

24  in published schedules. This practice is a legal business arrangement but provides a

25  mechanism that is conducive to illegal activities.

26      44.    According to the U.S. Department of Transportation and defendants, Air New

27  Zealand has code sharing agreements with EVA Air, Qantas, Japan Air, Northwest,

28  Singapore Air, and Thai Air. Singapore Air's code-share partners include All Nippon. Japan

1    Air is a code-share partner of Air New Zealand, Northwest, Qantas, Singapore Air and Thai

2    Air.  EVA Air has code sharing agreements with All Nippon, Qantas, American Airlines and

3    Air New Zealand.

4    45.    These types of marketing alliances have the potential for anticompetitive

5    conduct, as described below by an Assistant Attorney General from the U.S. Department of

6    Justice's Antitrust Division in testimony given before the Senate Committee on Commerce,

7    Science and Transportation in 1999:

8        [A]irline marketing alliances ... are essentially joint ventures between
         airlines.  These alliances fall somewhere between an outright merger and a
9        traditional arm's-length interline agreement.  Marketing alliances come in
         all shapes and sizes ... Alliances involving code-sharing are in many
10       respects the most controversial.  They have the potential to be pro-
         competitive -- they can create new service, improve existing service, lower
11       costs and increase efficiency, all to the benefit of the traveling public.
         Code sharing agreements also have the potential to be anticompetitive.
12       They can result in market allocation, capacity limitations, higher fares, or
13       foreclosure of rivals from markets, all to the injury of consumers ... the
         greatest threat to competition comes when two of very few airlines that
14       compete in a market enter into a code-sharing agreement in that market.

15   46.    In addition to their marketing relationships, the defendants in this case also

16   have close dealings through their participation in trade organizations.

17   47.    Each of the defendants is a member of the International Air Transport

18   Association ("IATA"), which describes itself as "the prime vehicle for inter-airline

19   cooperation in promoting safe, reliable, secure and economical air services ...." The IATA

20   collects and publishes industry intelligence and statistics, including route analysis of

21   operating and net margins, fuel consumption and unit fuel price paid, traffic figures, and

22   distribution of operating costs. Additionally, the IATA hosts multiple events each year for its

23   members, which provide an opportunity for executives from the airlines to socialize,

24   collaborate, and collude.  An agreement reached at an IATA meeting in Geneva on May 28,

25   2004 played a role in trigging the Fuel Surcharge conspiracy.

26   48.    Several of the defendants also serve on IATA's Board of Governors,

27   including, Singapore Air CEO Chew Choon Seng, Qantas CEO Geoff Dixon, Malaysia

28

-10-

1  Airline CEO Idris Jala, Japan Air Chairman Toshiyuki Shinmachi, and Northwest CEO
2  Douglas Steenland.

3       49.    The Association of Asia Pacific Airlines ("AAPA"), based in Kuala Lumpur,
4  Malaysia, is another industry group that facilitates defendants' collusion.   Defendants Air
5  New Zealand, All Nippon, China Air, EVA Air, Japan Air, Qantas, Singapore Air, and Thai
6  Air are all members of the AAPA. "The primary purpose of AAPA is to serve as a common
7  forum for the articulation of members' views on matters and issues of common interest."
8  "AAPA speaks with a common voice on behalf of the Asia Pacific carriers and puts forward
9  Asian perspectives when dealing with governments, aircraft manufacturers, airport
10  authorities and other organisations on industry issues. The activities of the Association cover
11  every aspect of civil aviation where the airlines feel they can work together for mutual
12  benefit. In addition, AAPA retains access to specialized legal and aviation consultants in
13  Brussels and Washington, a reflection of the significant impact which the profusion of U.S.
14  and E.U. regulatory developments have on all international carriers including Asia Pacific
15  airlines."

16       50.    Like the IATA, the AAPA collects and reports annual airport data, traffic
17  results, route statistics, financial indicators, fleet expansions, among other industry news.
18  These common associations facilitated the exchange of pricing information between
19  defendants.

20       C.    Defendants' Collusive Meetings

21       51.    Throughout the Class Period, defendants' executives as well as other air
22  carriers' executives, met formally or informally over the years at meetings of trade
23  associations and various other trade meetings. At one or more of these meetings, defendants
24  agreed to fix artificially inflated Fuel Surcharges for Transpacific Air Passenger
25  Transportation. Below are some examples of such meetings.

26       52.    Fuel costs were the main topic of IATA's Special Meeting on May 28, 2004
27  in Geneva, where agreements were reached on how to impose surcharges for fuel.   The
28  Montreal Gazette reported on June 1, 2004, that "member carriers of the International Air

1  Transport Association might raise international fares by as much as five percent to help cover
2  a surge in jet fuel costs.  The proposed fare increase of between two percent and five percent
3  was agreed at a May 28 meeting of the association, which represents more than 270 airlines
4  worldwide, an IATA spokesperson said."

5      53.    More than 600 airline executives attended IATA's Annual General Meeting
6  and World Air Transport Summit in Singapore on June 6-8, 2004.  In a welcoming statement,
7  IATA CEO Giovanni Bisignani stated, "While record high fuel prices challenges our
8  profitability it is time to put our efforts toward rebuilding the industry."  Immediately after
9  the Summit, Japan Airlines and All Nippon filed applications with the Japanese government
10  to raise international passenger fares by imposing a five percent fuel surcharge because of
11  high fuel costs.  In its news release announcing the fuel surcharge increase, Japan Airlines
12  stated: "The application follows a special meeting of the members of the International Air
13  Transport Association in Geneva, May 28, (2004) when a resolution was discussed to raise
14  fares in the wake of increased fuel prices.  This resolution has now been adopted."

15      54.    Numerous airline executives attended the 2005 International Flight Services
16  Association, Global Leadership Conference – Asia Pacific, held in Tokyo, Japan on August
17  30, 2005- September 1, 2005.  The theme of this conference was, "The Challenge of
18  Change."  Among the participants were Makoto Fukada, Managing Director and Senior Vice
19  President International Passenger, Japan Air; Nikom Raviyan, Vice President, Thai Air;
20  Sandeep Bahl, General Manager, Northwest; Shigeru Miyata, Vice President, Japan Air; and
21  Kriengsakdi Phatharacharukul, Director, Thai Airways.

22      55.    On September 19-21, 2006, AAPA sponsored Aviation Emergency Response
23  2006 in Bangkok, Thailand.  Executives of AAPA members and international airport officials
24  attended the meetings and discussed increasing revenues in the transpacific area by way of
25  fuel surcharges and other financial means.

26      56.    Executives from most of the defendant airlines, including Geoff Dixon, Chief
27  Executive Officer of Qantas, and Huang Cheng Eng, Executive vice President for Singapore
28  Airlines, participated in the Third Annual Asia Pacific and Middle East Aviation Outlook

1  Summit, held in Singapore on November 9-10, 2006. One of the issues presented and

2  discussed was "Fighting Costs: Fuel prices and managing risk exposure."

3      57.   Representatives of more than 120 aviation industry stakeholders, including

4  defendants, attended AAPA Forum in Bandar Sei Begawan, Brunei Darussalam on

5  November 28-29, 2006. Defendants and others discussed fuel surcharges at this meeting.

6      58.   Airline officials also met at the Asia Pacific Aviation Summit in Sydney,

7  Australia on July 24-25, 2007. One of the issues discussed at the Summit was the impact of

8  the investigation by the U.S. Department of Justice regarding fare price fixing. Another topic

9  was "working together efficiently" to diffuse the investigation of added surcharges.

10     D.    Defendants Coordinated Their Fuel Surcharges

11     59.   Defendants' conspiracy is also evidenced by, but not limited to, their lockstep

12 pricing of fuel surcharges imposed on transpacific flights to and from the United States.

13     60.   The close timing and pricing of defendants' fuel surcharges were not

14 coincidental. They were the product of an agreement by and among defendants to fix, raise,

15 maintain, and stabilize the prices for transpacific nights.

16     61.   In fact, a recent position paper from the Centre for Asia Pacific Aviation, a

17 provider of aviation market intelligence, supports this conclusion. The paper states: "Higher

18 fuel prices drove the flag carriers away from the mindless chase after market share into a

19 more considered quest for profitability."

20     62.   As a result of defendants' conspiracy, plaintiff and members of the Class paid

21 supra-competitive prices for passenger air transportation services sold by defendants.

22     63.   On May 11, 2004, Qantas and several other major airlines announced that they

23 would begin imposing fuel surcharges on passenger flights. Qantas' fuel surcharge- AU$15

24 for international flights - would go into effect on May 17, 2004 and would be in addition to

25 increases in passenger fares. The very next day, Air New Zealand announced that it too

26 would begin imposing fuel surcharges on passenger flights. Like Qantas, Air New Zealand's

27 fuel surcharges of NZ$20 for international flights would go into effect on May 17, 2004.

28     64.   On June 2, 2004, China Air and EVA Air sought to begin collecting a US$13

-13-

1  fuel surcharge on long-haul passenger air travel on June 17, 2004 but postponed the

2  imposition of fuel surcharge until July 1, 2004 due to the protest from the public.  China Air

3  fixed 70 percent of its fuel consumption for 2004 and hedged about 80 percent of its fuel

4  needs in 2004.  EVA Air had also hedged 60 percent of its fuel needs in 2004.

5       65.     On August 20, 2004, Qantas announced an increased fuel surcharge of AU$22

6  for international flights. Six days later, Air New Zealand announced that it would raise its

7  fuel surcharges as well.

8       66.     On October 20, 2004, Qantas raised fuel surcharges again to AU$29, even

9  though Qantas' fuel costs were fully hedged through the end of the year.  The announcement

10  also came just one day after Qantas reported a record full-year net profit of AU$648 million.

11  Six days after Qantas raised its fuel surcharges, Air New Zealand followed by raising its own

12  fuel surcharges for international flights.

13       67.     On February 1, 2005, All Nippon and Japan Airlines both implemented, for

14  the first time, a fuel surcharge of US$24 on flights between North America and Japan.  The

15  same day, Singapore Air raised its fuel surcharge for international sectors to US$22.

16       68.     On March 28, 2005, Qantas raised fuel surcharges on international flights to

17  US$35.  On April 6, 2005, Air New Zealand followed Qantas' lead by raising fuel surcharges

18  on long haul sectors to NZ$52.

19       69.     Beginning May 1, 2005, Thai Air charged a US$25 fuel surcharge on

20  International flights.

21       70.     On August 1, 2005, Thai Air raised fuel surcharges on international flights,

22  including those to and from the United States, to US$35.  Later that month on August 16,

23  2005, it raised fuel surcharges on international nights to US$50.

24       71.     Air New Zealand raised fuel surcharges on August 22, 2005 to NZ$92 for

25  international flights.  The next day, Qantas announced it would increase its fuel surcharges

26  on international flights to AU$75.

27       72.     On September 21, 2005, China Air and EVA Air announced they raised their

28  fuel surcharge to long-haul passenger travel to US$32.5 starting from October 1, 2005.

1     73.    On October 13, 2005, Northwest raised its fuel surcharge on transpacific
2   flights to US$65.

3     74.    On April 21, 2006, Qantas increased its fuel surcharges on international travel
4   to US$65.  Three days later, Northwest raised its fuel surcharge to US$75 for each
5   transpacific segment.

6     75.    On May 15, 2006, China Air raised its fuel surcharge for travel between
7   Taiwan and the United States to US$70 - ten times the original fuel surcharge implemented
8   less than two years before. On May 16, 2006, EVA Air raised its fuel surcharge for travel
9   between Singapore and the United States to US$65.  By May 22, 2006, Air New Zealand and
10  Qantas were both charging US$65 in fuel surcharges for international nights.

11    76.    On June 1, 2006, Thai Air raised its fuel surcharges on travel between the
12  United States and Bangkok to US$65, matching the fuel surcharges of EVA Air, Air New
13  Zealand, and Qantas.

14    77.    On July 25, 2006, Northwest raised its fuel surcharge for travel between the
15  United States and Singapore to US$90.   Singapore Air subsequently applied the same
16  surcharge on August 15, 2006.

17    78.    On August 31, 2006, Qantas raised surcharges again to AU$185, while
18  keeping domestic fuel surcharges unchanged.

19    79.    Thai Air increased it fuel surcharges on international flights on September 1,
20  2006. Notably, September 2006 saw a ten percent decline in prices for crude oil -- the largest
21  decline in 21 months.

22    80.    On October 1, 2006, All Nippon and Japan Air both raised their fuel
23  surcharges for transpacific travel to US$113.

24    81.    On October 14, 2006, Singapore Air lowered fuel surcharges for travel
25  between the United States and Singapore to US$82.

26    82.    Following the lead of Singapore Air, on January 1, 2007, All Nippon and
27  Japan Air lowered fuel surcharges on travel between North America and Japan to US$108.

28    83.    In January 2007, Qantas announced that due to a 25 percent drop in jet fuel

-15-

prices over the preceding five months, it would reduce fuel surcharges on certain of its flights. However, Qantas did not reduce the surcharges on any of its long-haul flights, including transpacific flights to or from the United States.  Consistent with Qantas, Air New Zealand's fuel surcharges on transpacific flights remained unchanged in early 2007.

84.    Singapore Air lowered its fuel surcharge on travel between the United States and Singapore to US$78 on February 1, 2007.

85.    On May 1, 2007, All Nippon and Japan Air both lowered fuel surcharges on international flights to US$91.

86.    On July 30, 2007, Northwest raised fuel surcharges for travel between the United States and Singapore to US$115.

87.    On August 10, 2007, EVA Air began charging a US$103 fuel surcharge on transpacific flights to the United States.

88.    On October 1, 2007, All Nippon and Japan Air raised their fuel surcharges to US$108.  That same day, Thai Air raised fuel surcharges for travel between the United States and Thailand to US$140.

89.    By November 7, 2007, Singapore Airlines was charging US$104 in fuel surcharges for travel between the United States and Singapore.

90.    The following fares and surcharges for round-trip coach cabin travel, published in November 2007 by www.flightstats.com, indicate that defendants' collusive pricing for fuel surcharges is continuing:

San Francisco (SFO) to Auckland (SYD)

| Airline | Base Fare | Surcharges | Total |
|---|---|---|---|
| Air New Zealand | $918 | $255 | $1173 |
| Qantas | $918 | $255 | $1173 |

///

///

///

///

-16-

San Francisco (SFO) to Bangkok (DMK)

| Airline | Base Fare | Surcharges | Total |
|---------|-----------|------------|-------|
| All Nippon | $650 | $281 | $931 |
| Japan Air | $620 | $281 | $901 |

San Francisco (SFO) to Hong Kong (HKG)

| Airline | Base Fare | Surcharges | Total |
|---------|-----------|------------|-------|
| All Nippon | $580 | $269 | $849 |
| Japan Air | $579 | $269 | $848 |

San Francisco (SFO) to Seoul (ICN)

| Airline | Base Fare | Surcharges | Total |
|---------|-----------|------------|-------|
| All Nippon | $620 | $296 | $916 |
| Japan Air | $620 | $289 | $909 |

San Francisco (SFO) to Sydney (SND)

| Airline | Base Fare | Surcharges | Total |
|---------|-----------|------------|-------|
| All New Zealand | $818 | $312 | $1130 |
| Qantas Air | $818 | $308 | $1126 |

San Francisco (SFO) to Taipei (TPE)

| Airline | Base Fare | Surcharges | Total |
|---------|-----------|------------|-------|
| EVA Air | $719 | $274 | $993 |
| Japan Air | $620 | $274 | $894 |
| Singapore Air | $900 | $274 | $1174 |
| Thai Air | $1660 | $274 | $1934 |
| Japan Air | $1575 | $274 | $1849 |

San Francisco (SFO) to Tokyo (NRT)

| Airline | Base Fare | Surcharges | Total |
|---------|-----------|------------|-------|
| All Nippon | $529 | $270 | $799 |
| Japan Air | $529 | $270 | $799 |

1    E.    Investigations by Competition Authorities

2    91.    The U.S. Department of Justice ("DOJ") began investigating air cargo and air

3    passenger Fuel Surcharge conspiracies worldwide in 2006. The ongoing investigation

4    includes transpacific flights to and from the United States.

5    92.    British Airways, which was a shareholder in Qantas when Qantas first

6    implemented fuel surcharges, has pleaded guilty to charges of antitrust violations and has

7    agreed to pay $300 million in fines as well. Those charges arose, in part, from British Air's

8    levying of passenger fuel surcharges on transatlantic flights. In its news release, the DOJ

9    stated: "The Department also charged that between August 2004 and February 2006, British

10   Airways engaged in a conspiracy to suppress and eliminate competition by fixing the Fuel

11   Surcharge charged to passengers on long-haul international flights."

12   93.    DOJ's investigation also includes transpacific flights to and from the United

13   States. The investigation is "ongoing" and includes other Defendants such as Northwest.

14   94.    On October 6, 2007, the Japanese daily newspaper Asahi Shimbun reported

15   that Japan Airlines would book a roughly $171 million charge for potential fines from a

16   global price fixing probe by U.S. and European Union officials. The newspaper stated:

17   The company's move comes after the U.S. Justice Department fined
     British Airways PLC and Korean Airlines Co. $300 million each in
18   August for fixing the price of passenger and cargo flights with other
     airlines. The company allegedly conspired to set fuel surcharges when oil
19   prices rose.

20   95.    In late December 2007, Japan Air, Singapore Air, All Nippon, Air New

21   Zealand and the Malaysia Air were charged with violating European competition rules

22   following European Commission's investigation of price fixing of fuel surcharges for air

23   cargo transportation.

24   96.    On January 14, 2008, Qantas accepted a plea agreement with the Department

25   of Justice which includes a $61 million fine for price fixing of air cargo transportation.

26   97.    The defendants' agreements to fix prices for fuel surcharges for air cargo

27   transportation create a strong inference that they also conspired to fix fuel surcharges for

28   passenger service.

-18-

1

## VII.    VIOLATIONS ALLEGED

2          98.     Plaintiff incorporates and realleges as though fully set forth herein, each and

3      every allegation set forth in the preceding paragraphs of this Complaint.

4          99.     Beginning at a time currently unknown to Plaintiff, but at least as early as

5      January 1, 2004, defendants and their co-conspirators, by and through their officers,

6      directors, employees, agents, or other representatives, entered into a continuing agreement,

7      understanding and conspiracy to unreasonably restrain trade and commerce to in violation of

8      Section 1 of the Sherman Act (15 U.S.C. §1).

9          100.    Defendants, by their unlawful conspiracy, artificially raised, inflated and

10     maintained the market prices of Transpacific Air Passenger Transportation and Fuel

11     Surcharges as herein alleged.

12         101.    Upon information and belief, for the purpose of formulating and effectuating

13     their contract, combination or conspiracy, defendants and their co-conspirators did those

14     things they contracted, combined or conspired to do, including but not limited to the acts,

15     practices, and course of conduct set forth above, and the following, among others:

16                      a.      participating in meetings, conversations, and communications with

17                              competitors to discuss the prices of Transpacific Air Passenger

18                              Transportation and Fuel Surcharges;

19                      b.      agreeing to the prices that would be charged for Transpacific Air

20                              Passenger Transportation and Fuel Surcharges;

21                      c.      signaling increases in the prices of Transpacific Air Passenger

22                              Transportation and Fuel Surcharges by, inter alia, issuing price

23                              announcements and price quotations; and

24                      d.      charging Transpacific Air Passenger Transportation and Fuel

25                              Surcharges at agreed rates in lockstep; and

26         102.    During the Class Period, the defendants increased the Transpacific Air

27     Passenger Transportation and Fuel Surcharges they charged to consumers.  These increases

28     in Transpacific Air Passenger Transportation and Fuel Surcharges cannot be explained by

-19-

1 | actual increases in fuel prices or supply/demand forces, but rather were the results of

2 | defendants' anticompetitive conduct.

3 | **VIII.   EFFECTS**

4 | 103.   The above combination and conspiracy has had the following effects, among

5 | others:

6 | a.   price competition in the sale of Transpacific Air Passenger

7 | Transportation and Fuel Surcharges by defendants and their co-

8 | conspirators has been restrained, suppressed and eliminated throughout

9 | the United States;

10 | b.   prices for Transpacific Air Passenger Transportation and Fuel

11 | Surcharges sold by defendants has been raised, fixed, maintained and

12 | stabilized at artificially high and non-competitive levels throughout the

13 | United States; and

14 | c.   purchasers of Transpacific Air Passenger Transportation from

15 | defendants have been deprived of the benefit of free and open

16 | competition in the purchase of such services.

17 | 104.   As a direct and proximate result of the unlawful conduct of defendants and

18 | their co-conspirators in furtherance of their continuing contract, combination or conspiracy,

19 | plaintiff and other members of the Class have been injured and will continue to be injured in

20 | their business and property by paying more for passenger air transportation services than they

21 | would have paid and will pay in the absence of defendants' combination and conspiracy.

22 | **IX.   DAMAGES**

23 | 105.   During the Class Period, plaintiff and the other members of the Class

24 | purchased Transpacific Air Passenger Transportation directly from defendants, or their

25 | subsidiaries, agents, and/or affiliates, and by reason of the antitrust violations herein alleged,

26 | paid more for Fuel Surcharges and other fees than they would have paid in the absence of

27 | such antitrust violations.  As a result, plaintiff and the other members of the Class have

28 | sustained damages to their business and property in an amount to be determined at trial.

-20-

CLASS ACTION COMPLAINT

## X.    **PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment against defendants as follows:

A.      A declaration that this action is a proper class action under Federal Rule of Civil Procedure 23(b)(3) on behalf of the Class defined herein, and an Order directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to each member of the Class;

B.      A declaration that the unlawful combination and conspiracy alleged herein is an unreasonable restraint of trade of commerce in violation of Section 1 of the Sherman Act (15 U.S.C. §1);

C.      An injunction enjoining, preliminarily and permanently, defendants from, in any manner, directly or indirectly, continuing, maintaining or renewing the unlawful combination and conspiracy alleged herein;

D.      An award to plaintiff and each member of the Class damages, as provided by law, and joint and several judgments in favor of plaintiff and each member of the Class against defendants, and each of them, in an amount to be trebled in accordance with the antitrust laws;

E.      An award to plaintiff and the Class for the costs of this suit (including expert fees), reasonable attorneys' fees, and prejudgment and post judgment interest as provided by law; and

///

///

///

///

///

///

///

///

///

1    F.    An award to plaintiff and the Class for such other and further relief as the

2    nature of this case may require or as this Court deems just, equitable and proper.

3    Dated: January 17, 2008

4

5    By: _____

         Craig C. Corbitt

6

7    Craig C. Corbitt (No. 83251)
     Matthew R. Schultz (No. 220641)
     Jiangxiao Athena Hou (No. 215256)

8    Patrick B. Clayton (No. 240191)
     ZELLE, HOFMANN, VOELBEL, MASON

9       & GETTE LLP
     44 Montgomery Street, Suite 3400

10   San Francisco, CA  94104
     Telephone:     (415) 693-0700

11   Facsimile:     (415) 693-0770

12   *Attorneys for Plaintiff and the Class*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-22-

CLASS ACTION COMPLAINT

1                        **JURY TRIAL DEMAND**

2         Pursuant to Rule 38 (b) of the Federal Rules of Civil Procedure and the Constitution

3 of the United States, Plaintiff demands a trial by jury of all issues so triable.

4 Dated: January 17, 2008               Respectfully submitted,

5

6

7                           By: _____
                                  Craig C. Corbitt

8

9                 Craig C. Corbitt (No. 83251)
                Matthew R. Schultz (No. 220641)

10                 Jiangxiao Athena Hou (No. 215256)
                Patrick B. Clayton (No. 240191)

11                 ZELLE, HOFMANN, VOELBEL, MASON
                    & GETTE LLP

12                 44 Montgomery Street, Suite 3400
                San Francisco, CA 94104

13                 Telephone:   (415) 693-0700
                Facsimile:    (415) 693-0770

14                 *Attorneys for Plaintiff and the Class*

15

16
  #3171708v2
17

18

19

20

21

22

23

24

25

26

27

28

                                        -23-